IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOHN D. WILLS,                                    3:09-cv-01316-BR

       Plaintiff,

                                       OPINION AND ORDER

v.

DR. DIEHL; DR. VAN HOUTEN;
H. MILLER; M. SHOTTS;
D. GARDENER; E. PURCELL;
P. MAINE; P. SHELTON;
M. GROWER; JOHN and JANE
DOES, sued in their official
and individual capacities,

       Defendants.

**MICHELLE R. BURROWS**
22586 S.W. Park St.
Sherwood, OR 97140
(503) 241-1955

       Attorney for Plaintiff

**ELLEN ROSENBLUM**
Attorney General
**KRISTIN A. WINGES-YANEZ**
Assistant Attorney General
Oregon Department of Justice
1515 S.W. Fifth Avenue
Suite 410
Portland, OR 97201
(971) 673-1880

       Attorneys for Defendants

1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendants' Motion (#190) to Strike and Defendants' Motion (#176) for Summary Judgment.  For the reasons that follow, the Court **GRANTS** Defendants' Motion to Strike and Defendants' Motion for Summary Judgment.


## FACTUAL BACKGROUND

On September 23, 2008, Plaintiff John D. Wills, who was an inmate at Eastern Oregon Correctional Institution (EOCI),[1] was injured when he lifted a heavy load of laundry into the dryer.  On September 24, 2008, Plaintiff reported his injury to his supervisor, who sent Plaintiff to the infirmary.  Plaintiff testifies in his Declaration that he "was given 48 hours off work and told he would be seen by a doctor on 9/28."  Decl. of John Wills at ¶ 7.

On October 3, 2009, Plaintiff was seen by a doctor and diagnosed with an inguinal hernia.  Plaintiff testifies in his Declaration that he received a prescription for Tylenol 3, but he "was not given any further time off [of work] or any care for the immediate injury or pain."  Wills Decl. at ¶ 8.

On October 6, 2008, Defendant Joseph Diehl, M.D., submitted

---

[1] At all relevant times Plaintiff was an inmate at EOCI. Plaintiff is currently incarcerated at Santiam Correctional Institution.

a Prior Authorization for Medical/Surgical Procedure or Treatment form to the Oregon Department of Corrections (ODOC) Therapeutic Level of Care (TLC) Committee.  Dr. Diehl noted Plaintiff had suffered an inguinal hernia and requested Plaintiff to be scheduled for "general surgery" for repair of his injury.  Diehl Decl., Ex. 1 at 1.  The TLC Committee approved Dr. Diehl's request.

Plaintiff testifies in his Declaration that on October 20, 2008, he went to the infirmary "seeking a hernia belt to help [with pain], but I was denied."  Wills Decl. at ¶ 9.

On October 29, 2008, John McBee, M.D., saw Plaintiff for a surgical consultation related to Plaintiff's hernia.  Dr. McBee recommended Plaintiff to be "schedule[d] for hernia repair at a time convenient to the prison regarding scheduling."  Wills Decl., Ex. 1 at 3.

On November 5, 2008, Plaintiff went to "sick call" at which Defendant H. Miller, N.P., reported Plaintiff's hernia had increased in size and that issue would be "addressed by Dr. McBee."

On November 5, 2008, after Plaintiff's sick call, correctional officers received a report that Plaintiff was a "man down" in the laundry.  Plaintiff reported suffering a "sharp pain" when he was reaching for laundry that caused him to fall and hit the back of his head on a metal table or countertop.

EOCI medical staff noted Plaintiff was awake and oriented, reported neck pain, and was unsure whether he had lost consciousness.  Medical staff diagnosed Plaintiff with a possible "C-spine injury" and "incarcerated hernia."  Diehl Decl., Ex. 1 at 10.  Plaintiff was transported to the Emergency Room at St. Anthony Hospital.  Plaintiff underwent CT scans of his head and cervical spine.  The images of Plaintiff's head did not show any evidence of "hemorrhage, mass or mass effect, or abnormal extra axial fluid collection."  Diehl Decl., Ex. 2 at 3, 37. Although Plaintiff's cervical spine CT did not show any evidence of trauma, it showed "extensive calcification of the posterior longitudinal ligament" at C5-C7, which caused "some effacement of the thecal sac and the cord."  Wills Decl., Ex. 2 at 1.  At deposition Dr. Diehl explained the results of Plaintiff's spinal CT in lay terms as follows:

> A.   It means he has some degenerative changes that have occurred over time.  And the -- I will try to put it in lay terms.  He has some pressure on his spinal cord because of that.
>
> * * *
>
> Q.   And it also indicates here, not only is there a narrowing of the central canal, there is a deformity of the cord.  What does that mean in lay terms?
>
> A.   That means that the canal is narrowed, so the cord is being compressed.

Wills Decl., Ex. 17 at 5-6.

Plaintiff was returned to the EOCI infirmary on November 5,

4 - OPINION AND ORDER

2008, and remained overnight for monitoring.  Plaintiff was
prescribed Tylenol 3 for pain.

At Plaintiff's morning assessment on November 6, 2008, the
treating Nurse noted Plaintiff complained about pain in the back
of his neck from C1 through C5 at the level of "1-2/10."  Diehl
Decl., Ex. 2 at 11.  At Plaintiff's afternoon assessment the
treating Nurse noted Plaintiff complained about pain in the back
of his neck from C1 through C5 at the level of nine out of ten
and reported Tylenol 3 was not helping to reduce his pain.
Accordingly, the treating nurse prescribed Ibuprofen to address
Plaintiff's pain.  At 5:30 p.m. Plaintiff was returned to his
housing unit after medical staff observed Plaintiff's
neurological status remained "within normal limits."  Diehl
Decl., Ex. 2 at 3.

On November 10, 2008, Plaintiff reported to the infirmary
and complained about popping and cracking in his neck and
numbness in his left buttock, foot, and thigh.  Diehl Decl.,
Ex. 2 at 12.  Medical staff diagnosed Plaintiff with pain
secondary to muscle spasms following Plaintiff's fall and
prescribed Tylenol, a hot shower, and hot pack.  *Id*.

On November 14, 2008, Plaintiff was transported to
St. Anthony's for hernia repair.  Plaintiff returned to EOCI for
post-operative care the same day.  EOCI medical staff noted
Plaintiff reported pain at a level of six out of ten, but that

Plaintiff was "pleasant and in good spirits."  Diehl Decl., Ex. 2 at 13.

On November 17, 2008, Dr. Diehl examined Plaintiff. Plaintiff reported he was "feeling better" and had only minor pain at his incision.  Diehl Decl., Ex. 2 at 16.

On November 19, 2008, Plaintiff complained about neck and shoulder discomfort, which Dr. Diehl believed to be "consistent with tapering-off pain medications post-operatively."  Diehl Decl., Ex. 2 at 4.  Dr. Diehl evaluated Plaintiff and did not note any weakness or numbness.  Plaintiff "denied any peripheral weakness, numbness or pain in his legs."  Diehl Decl., Ex. 2 at 4.  Dr. Diehl diagnosed Plaintiff with cervical strain with "chronic stenosis," prescribed Ibuprofen, and planned to ask a neurosurgeon to review Plaintiff's November 2008 CT scan.  *Id.*

On December 3, 2008, Plaintiff reported for sick call complaining about neck and back pain and requesting hot packs. Medical staff noted Plaintiff was not in any acute distress, but he was suffering limitations in his cervical range of motion due to stiffness.  Plaintiff was prescribed hot packs to be used three-to-four times a day "as needed."  Diehl Decl., Ex. 2 at 21.

On December 8, 2008, Perry Camp, M.D., neurosurgeon, reviewed Plaintiff's November CT Scan and requested an MRI of Plaintiff's cervical spine even though Dr. Camp did not believe further treatment of Plaintiff's spine was necessary at that

time.  Diehl Decl., Ex. 2 at 4, 21.

On December 26, 2008, Plaintiff had an MRI of his cervical spine, which showed "calcification of the posterior longitudinal ligament which causes significant narrowing of the central canal, and deformity of the cord" at C5-C6 and C6-C7.  Wills Decl., Ex. 3 at 1.  The MRI also showed "[t]he cord appears to maintain normal signal" despite the narrowing of the central canal at C5-C6 and C6-C7.  *Id*.  In addition, the MRI showed at T2-T3 Plaintiff had "uncovebral and endplate ostepophytes effacing the central canal, deforming the cord, and narrowing the right neural foramen."  *Id*.

On December 31, 2008, Defendant Grant Van Houten, M.D., treating physician, requested, and the TLC Committee approved, a neurosurgery consult for Plaintiff based on the results of Plaintiff's MRI.

Also on December 31, 2008, Plaintiff reported to the infirmary complaining about back pain that he had experienced since his November 2008 fall.  Medical staff noted Plaintiff had good range of motion and no spasms.  Diehl Decl., Ex. 2 at 22. Plaintiff stated his back did not hurt "at this moment," but it "starts to hurt when [he is] active."  *Id*.  Medical staff advised Plaintiff that they would refer his complaint to Dr. Van Houten.

On January 7, 2009, Plaintiff went to sick call complaining about continuing neck pain.  Plaintiff requested a "wedge

[pillow] to help [him] sleep," but his request was denied.  Diehl Decl., Ex. 2 at 22.

On January 16, 2009, Plaintiff reported to the infirmary complaining about neck pain waking him in the night.  Medical staff noted Plaintiff did not appear to be in distress and had adequate range of motion in his neck.  Plaintiff's hand grasp was noted to be "equal bilaterally."  Diehl Decl., Ex. 2 at 23. Medical staff reassured Plaintiff that an appointment for a surgical consult would be scheduled for him.

On January 22, 2009, Dr. Camp saw Plaintiff for a neurosurgical consultation.  Dr. Camp noted Plaintiff's December MRI showed "abnormality of the core/bulging disc at C5-6 C6-7." Diehl Decl., Ex. 2 at 49.  Dr. Camp noted Plaintiff's cervical range of motion was "modestly diminished."  *Id.* at 52.  Dr. Camp diagnosed Plaintiff with "cervical spondylosis with probable early myelopathy, primarily manifested by mild left C6 distribution weakness and relative lower extremity hyperreflexia."  *Id.* at 54.  Dr. Camp recommended traction to be performed three times a day and "sleeping with a thin, firm pillow that can be rolled so that the head will not tilt."  *Id.* Dr. Camp noted "if [Plaintiff's] soft myelopathic findings increase or if he has recurring sensory myelopathy symptoms, it would be reasonable to consider operative management."  *Id.* at 55.

On January 24, 2009, Plaintiff reported to the infirmary for traction.  Plaintiff alleges none of the medical providers at the infirmary knew how to fit the neck brace to Plaintiff.  Plaintiff testifies in his Declaration that after ten minutes in traction, his shoulders and back began to hurt and his left side to feel numb.

On January 25 and 26, 2009, Plaintiff underwent traction again.  Plaintiff testifies in his Declaration that his arms were numb after the January 25 session and he began to get constant headaches and suffer shoulder and neck pain as well as numbness in his arms and hands after the January 26 session.

On January 28, 2009, Plaintiff underwent traction again, but he was ordered by Nurse Maney to stop traction until Plaintiff could see a doctor due to Plaintiff's complaints about pain and numbness.  Plaintiff's medical records do not reflect any information related to any of Plaintiff's traction treatments.

On January 30, 2009, Plaintiff cancelled his traction treatment.  Plaintiff reported he had been having neck and shoulder pain from traction.  Plaintiff also reported he "heard a pop in [his] shoulder last night and now [his] neck and shoulder don't hurt anymore."  Diehl Decl., Ex. 2 at 24.  Nevertheless, Plaintiff wanted to "make sure [he was] okay to do the traction."  Diehl Decl., Ex. 2 at 24.  The treating nurse noted Plaintiff did not appear to be in acute distress, had good range of motion in

his neck and shoulders, and had "hand grasp equal bilat[erally]." *Id*. The treating nurse encouraged Plaintiff to rest until he could be seen by a doctor. *Id*.

On February 4, 2009, Plaintiff went to sick call complaining about chronic back pain, noting Ibuprofen and/or Tylenol were not effective at controlling his pain, and stating hot packs provided only temporary pain relief. Diehl Decl., Ex. 2 at 24. Plaintiff noted he had an appointment with Dr. Van Houten scheduled for February 5, 2009, regarding his neck pain. Plaintiff was advised to continue using hot packs and to tell Dr. Van Houten that Ibuprofen and/or Tylenol were not controlling his pain. *Id*.

On February 5, 2009, Dr. Van Houten saw Plaintiff, who reported traction had increased his neck pain and that he was not getting sufficient pain relief from Ibuprofen or Tylenol. Dr. Van Houten discontinued Plaintiff's traction and prescribed Naprosyn 500 mg. twice a day for two months as an anti-inflammatory treatment. Diehl Decl., Ex. 2 at 25.

Plaintiff testifies in his Declaration that on February 10, 2009, "medical seized the hot pad I had been using." The medical record notes Plaintiff "returned [the] hot pack."

On February 9, 2009, Plaintiff filed a petition for writ of habeas corpus against Superintendent Rick Coursey in Umatilla County Circuit Court in which Plaintiff sought habeas relief for pain medication, spine injury, and deliberate indifference to his

serious medical needs at EOCI.

On February 10, 2009, Plaintiff's annual prescription for Prilosec, which he had been taking for two years for acid reflux, expired. On February 11, 2009, Plaintiff reported to the infirmary in order to renew his Prilosec prescription. Medical staff noted they needed to review Plaintiff's prescription with a staff doctor.

On February 13, 2009, Plaintiff was seen at sick call. Plaintiff complained about neck pain and reported: "[L]ast night my left thumb flexed in and stayed that way for ½ [an] hour." Diehl Decl., Ex. 2 at 25. Plaintiff reported he did not have any severe pain in his thumb, but his wrist was a "little sore." *Id*. A nurse examined Plaintiff and reported he had the full range of motion in his left thumb and equal strength in his hands. Plaintiff was advised to report to Health Services if he needed a follow-up appointment with a doctor.

On February 20, 2009, Plaintiff reported to sick call to ask about renewal of his prescription for Prilosec. A nurse advised Plaintiff that his chart would be given to a doctor for review.

On February 25, 2009, Plaintiff received a dose of Prilosec. Diehl Decl., Ex. 3 at 64.

On February 26, 2009, Dr. Van Houten saw Plaintiff for the increased pain and numbness in his left arm. Plaintiff testifies in his Declaration that he also requested an extra pillow, but

11 - OPINION AND ORDER

Dr. Van Houten refused to prescribe an extra pillow.  Dr. Van
Houten noted he would review Plaintiff's reports of pain and
numbness with Dr. Camp.

Plaintiff's progress notes show on February 26, 2009,
medical staff telephoned Dr. Camp about Plaintiff's reports of
pain and numbness.  Dr. Camp requested Plaintiff to be
reevaluated.

On February 27, 2009, Plaintiff reported to sick call to
refill his Prilosec prescription.  Plaintiff testifies in his
Declaration that he did not receive his Prilosec refill until
March 4, 2009, but Plaintiff's February 27, 2009, progress notes
reflect Plaintiff's prescription was renewed on February 27,
2009.  Diehl Decl., Ex. 2 at 57.  In addition, Plaintiff's
Medication Administration Record shows Plaintiff received his
Prilosec refill on February 27, 2009.  Diehl Decl., Ex. 3 at 64.

When Plaintiff reported to sick call on February 27, 2009,
he also complained about occasional lumbar pain down into his
left leg and requested a hot pack.  Medical staff prescribed a
hot pack for two weeks.

On March 3, 2009, Dr. Camp saw Plaintiff and noted
Plaintiff's cervical range of motion was "diminished" and
Plaintiff had "weakness in his left arm and primarily biceps" as
well as "decreased biceps reflexes relative to his triceps."
Diehl Decl., Ex. 2 at 72.  Dr. Camp concluded:  "Given his

12 - OPINION AND ORDER

failure to improve symptoms on conservative treatment . . . it seems reasonable to consider operative management. . . .  In the meantime, sleeping with a thin, firm pillow will likely help his night-time symptoms." *Id.* at 76.

On March 11, 2009, Plaintiff reported to sick call requesting a hot pad.  Plaintiff stated he had continuing back pain but denied current numbness.  Medical staff issued Plaintiff a hot pad for two weeks.

On March 30, 2009, Dr. Camp performed surgery on Plaintiff for an "anterior cervical diskectomy with Smith/Robinson fusion C5-6 and C6-7 and synthes locking plate implant" to address Plaintiff's "history of C6 cervical spondylosis."  Diehl Decl., Ex. 2 at 8.  Dr. Camp directed Plaintiff to avoid Naprosyn and other "NSAIDs" for three months after surgery.  Dr. Camp prescribed Percocet "5/325 1-2 every 4 hours when nec[essary] for pain" and directed Plaintiff to undergo a cervical-spine x-ray six weeks after surgery.  Diehl Decl., Ex. 2 at 83-84.  Plaintiff's Medical Administration Record reflects he was given Percocet on March 30 and 31.  Diehl Decl., Ex. 3 at 64.  On March 31, 2009, Plaintiff reported minimal pain around his incision.

On April 1, 2009, at midnight Plaintiff reported another inmate patted him on the back earlier, and he then experienced pain in the back of his neck at a level of eight out of ten.  At

13 - OPINION AND ORDER

2:30 a.m. Plaintiff reported his pain was "almost gone." Diehl
Decl., ex. 3 at 10. At 9:00 a.m. Plaintiff reported his pain was
four or five out of ten and he did not have any numbness.

From April 2 through April 4, 2009, Plaintiff reported his
pain was better at three to four out of ten without numbness.

From April 5 through April 8, 2009, Plaintiff was given
Roxicet for pain when he asked and reported his pain was well
controlled. On April 8, 2009, Plaintiff's prescription for
Roxicet expired.

From April 9 through April 16, 2009, Plaintiff reported
tightness in his shoulders, but minimal pain generally that was
managed with Tylenol.

On the morning of April 16, 2009, Plaintiff reported he had
experienced pain at a level of seven or eight out of ten the
prior night. Plaintiff reported neither Tylenol nor heat helped.
Plaintiff noted his pain at 10:00 a.m. was three out of ten.
Plaintiff was given Tylenol. At 10:30 p.m. Plaintiff mentioned
his pain the prior night and requested Elavil, which had "helped
a lot in the past." Diehl Decl., Ex. 3 at 18.

From April 17 through April 22, 2009, Plaintiff experienced
occasional spikes of pain, but he generally reported his pain was
manageable with Tylenol. On April 19 and 20, 2009, Plaintiff
expressed concern about getting Elavil refilled "just in case for
pain." Diehl Decl., Ex. 3 at 20. Medical staff ordered Elavil

14 - OPINION AND ORDER

for Plaintiff for four weeks.  Diehl Decl., Ex. 3 at 20, 66.

Plaintiff testifies in his Declaration that on April 23, 2009, he filed a grievance "based on the lack of pain management and staff indifference."  Wills Decl. at ¶ 52.  Plaintiff testifies Defendant Nurse M. Shotts "rebuked [Plaintiff] for seeking administrative and judicial remedies for treatment . . . [and] threatened to create false accusations of criminal conduct if [Plaintiff] did not stop [his] grievances and lawsuits."  *Id.*

Plaintiff testifies in his Declaration that he reported Nurse Shotts's behavior "to the AG" on April 29, 2009.

On May 1, 2009, Dr. Diehl discharged Plaintiff from the infirmary to return to general-population housing.  Dr. Diehl concluded Plaintiff was able to perform "activities of daily living and no longer required the daily nursing care that he received in the infirmary."  Diehl Decl. at ¶ 16.  Dr. Diehl's discharge included orders for Plaintiff to be assigned to a lower bunk, not to lift over 15 pounds, and not to work for eight weeks.  Diehl Decl. at ¶ 15.  Dr. Diehl prescribed Plaintiff Neurotonin for pain relief,[2] Omeprazole for heartburn, and Lipitor for high cholesterol.  *Id.*

On May 14, 2009, Dr. Van Houten saw Plaintiff who complained about continuing pain.  Dr. Van Houten noted Plaintiff could not

---

[2] As noted, Dr. Camp prohibited NSAIDs for pain relief for three months after Plaintiff's surgery on March 30, 2009. Dr. Diehl, therefore, did not prescribe a NSAID for pain relief.

take NSAIDs for pain until after June 30, 2009, per Dr. Camp and prescribed Tylenol.

On May 27, 2009, Plaintiff requested his prescription for Neurotonin be renewed.  Plaintiff noted he had been having neck pain "off and on but not excessive."  Diehl Decl., ex. 3 at 28. Plaintiff's prescription for Neurotonin was renewed.

On June 1, 2009, Dr. Van Houten saw Plaintiff and reported Plaintiff was "doing pretty well."  Diehl Decl., Ex. 3 at 29.

On June 24, 2009, Dr. Diehl saw Plaintiff to address Plaintiff's ongoing complaints of neck and back pain.  Dr. Diehl found Plaintiff had 50% range of motion in his cervical spine and tenderness over his "post-surgical area but no muscle spasms." Diehl Decl. at ¶ 18.  Dr. Diehl diagnosed Plaintiff with "chronic neck pain secondary to degenerative disk disease" and prescribed Elavil and Naprosyn for pain management.

On July 6, 2009, Plaintiff reported Elavil was causing him to suffer "excessive drowsiness" at his current dosage. Dr. Diehl lowered Plaintiff's dosage.

On July 22, 2009, Dr. Diehl saw Plaintiff and increased Plaintiff's dosage of Elavil.  He directed Plaintiff to take it only at bedtime.

On July 27, 2009, Umatilla County Court Judge Tom Leggert granted Coursey's motion to dismiss Plaintiff's state habeas action and entered a judgment in Coursey's favor finding "no

16 - OPINION AND ORDER

evidence of deliberate indifference."  Decl. of Kristin A.
Winges-Yanez, Ex. 6 at 1.

On August 4, 2009, the TLC Committee reviewed Plaintiff's
medical history at Dr. Diehl's request and approved a
consultation for Plaintiff with Jerry Becker, M.D., an orthopedic
surgeon in Salem, Oregon.  Diehl Decl. at ¶ 23, Ex. 4 at 1.

Plaintiff continued to complain about pain.  Accordingly, on
August 11, 2009, Dr. Diehl ordered Plaintiff's progress notes to
be faxed to Dr. Camp for a recommendation.

On September 8, 2009, Plaintiff was transported to Salem,
Oregon, to be evaluated by Dr. Becker.  Plaintiff was transported
back to EOCI on September 10, 2009, before being seen by
Dr. Becker in order for Plaintiff to keep an appointment with
Dr. Camp.

On September 15, 2009, Dr. Camp saw Plaintiff for
reevaluation of Plaintiff's neck pain and for suboccipital
headaches.  Dr. Camp spoke with Plaintiff "at some length"
regarding

> evaluation and treatment of persistent
> suboccipital headaches, which are basically a side
> effect of neck fatigue in the setting of altered
> biomechanics of the neck.  Normally the first
> stage of this treatment is a combination of active
> (cervical range of motion with weights less than 4
> pounds in traction) and passive physical therapy
> to the neck and shoulder area.  This is usually
> done early in the course of treatment to
> ameliorate symptoms and can include therapeutic
> massage and physical modalities for management of
> the neck tension.

17 - OPINION AND ORDER

* * *

    If after an interval of 4-6 weeks of passive
therapy with active therapy there are continuing
symptoms, we usually get a magnetic resonance
imaging of the neck and active flexon-extension
views of the neck.  The magnetic resonance imaging
is done primarily to see if there is evidence of
hypermobility and breakdown at the adjacent
segment.

* * *

    If those modalities fail, as I discussed today
with [Plaintiff], we usually just have a
circumstance where the best treatment in the long
term is no treatment.  We do not recommend taking
chronic medications for this problem unless those
medications might be something like Elavil or
Neurontin.

Wills Decl., Ex. 9 at 1-2.

    On September 28, 2009, Dr. Diehl ordered Plaintiff to

receive an extra pillow for one year and to undergo cervical

traction with three-pound weights twice a day for one month.

    On October 19, 2009, Plaintiff requested a refill of his

Elavil prescription.  Plaintiff reported Elavil was "helpful."

On October 21, 2009, Dr. Diehl renewed Plaintiff's Elavil

prescription for three months.

    On November 13, 2009, Plaintiff reported chronic neck pain

and asked if his Elavil dosage could be increased.  Plaintiff

also requested renewal of his prescription for Naprosyn.

    On November 16, 2009, Dr. Diehl increased Plaintiff's dosage

of Elavil for three months and renewed Plaintiff's Naprosyn

18 - OPINION AND ORDER

prescription.

On January 11, 2010, Dr. Diehl renewed Plaintiff's Naprosyn prescription for three months.

On March 22, 2010, Dr. Diehl renewed Plaintiff's Elavil prescription for six months.

On March 24, 2010, Dr. Diehl renewed Plaintiff's Neurontin prescription for six months.

As noted, on June 15,2010, Plaintiff transferred from EOCI to OSCI.


**PROCEDURAL BACKGROUND**

On November 5, 2009, Plaintiff filed an action *pro se* in this Court under 42 U.S.C. § 1983 against Dr. Diehl, Dr. Van Houten, Nurse Miller, Nurse Shotts, Nurse Gardner, Nurse Purcell, EOCI Grievance Coordinator P. Maines, ODOC Chief Medical Officer P. Shelton, ODOC Assistant Director of Operations M. Gower, and John and Jane Does.  Plaintiff asserted claims for (1) deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment, (2) retaliation for Plaintiff's exercise of his right to free speech, and (3) denial of "meaningful due process."

On September 28, 2011, attorney Michelle Burrows filed a Notice of Appearance of Counsel for Plaintiff advising the Court that she would be representing Plaintiff in this matter.

19 - OPINION AND ORDER

On November 23, 2011, Plaintiff filed an Amended Complaint against the same Defendants in which he alleges claims for deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment and retaliation for Plaintiff's exercise of his right to free speech in violation of the First Amendment.

On June 7, 2013, Defendants filed a Motion for Summary Judgment as to all of Plaintiff's claims.

On August 5, 2013, Defendants filed a Motion to Strike Exhibit 7 to the Declaration of Michelle Burrows.

The Court took Defendants' Motions under advisement on August 22, 2013.

## DEFENDANTS' MOTION TO STRIKE

Defendants move to strike Exhibit 7 to the Declaration of Michelle Burrows filed in support of Plaintiff's Response to Defendants' Motion for Summary Judgment.

**I. Background**

On April 16, 2012, the Court directed the parties to attempt to secure an independent medical examination of Plaintiff and authorized $3,000 to pay for the medical examination.

At some point before May 22, 2012, Burrows contacted Todd Woods, M.D., to schedule Plaintiff's independent medical examination. Dr. Woods advised Burrows that he would require an

additional $2,000 to conduct the examination and to provide a
report of his findings.  Accordingly, on July 3, 2012, the Court
authorized further payment of $2,000 to secure the examination.

On August 30, 2012, the parties advised the Court in a Joint
Status Report that Plaintiff's medical examination with Dr. Woods
was scheduled for the first week in September.

On October 4, 2012, the parties advised the Court in a Joint
Status Report that Dr. Woods had conducted the medical
examination of Plaintiff and that the parties had received copies
of Dr. Woods's report.  The parties advised the Court that
"[f]urther discussion about this report must take place with
[Dr. Woods] to interpret the findings and determine the
evaluation's bearing on the issues remaining in the case."  Jt.
Status Rept. (#156) at 1.

On November 20, 2012, the parties advised the Court in a
Joint Status Report that Dr. Woods had

> been paid $5000 of public funds from the Pro Bono
> Fund and the Department of ODOC. . . .  He demands
> an additional $1000 before he will talk with
> counsel to provide his interpretation of a barely
> cognizable report.

Jt. Status Rept. (#162) at 1.  The parties advised the Court that
Plaintiff was able to secure the $1,000 requested by
Dr. Woods, but there was a delay in getting the funds to
Dr. Woods.  The parties "anticipated that a telephone conference
with both counsel and Dr. Woods [could] be arranged before

21 - OPINION AND ORDER

December 15." *Id.* at 2.

On January 22, 2013, the parties advised the Court in a
Joint Status Report that Dr. Woods had been paid $5,000 from the
public Pro Bono Fund and ODOC, $1,000 by Plaintiff, and $600 more
to "secure a telephone conference with Dr. Woods for January 23,
2013." Jt. Status Rept. (#168) at 1.  The parties advised the
Court that counsel for Plaintiff and Defendants would be present
at the telephone conversation with Dr. Woods, and "[i]t is hoped
beyond measure that Dr. Woods can provide some insight into his
report." *Id.*

On January 25, 2013, Plaintiff advised the Court in a Status
Report that

> [o]n January 23, 2013 a telephone conference was
> held.  Dr. Woods refused to allow the Attorney
> General to participate due to his concerns over
> privacy restrictions under HIPPA.  Even though it
> was explained to the doctor that this was an
> independent exam paid for by all parties, he would
> not participate.  In order to get this case
> moving, Plaintiff's counsel interviewed Dr. Woods
> but sent a confirming email to the AG. . . .  The
> interview with Dr. Woods lasted approximately 24
> minutes and is summarized in the report attached
> as Exhibit 3.

Status Rept. (#169) at 2-3.  The record reflects there was not a
court reporter present during the conversation nor was there any
other contemporaneous recording of Burrow's conversation with
Dr. Woods.  Burrows testified in her Declaration in support of
the Status Report that she "wrote a summary [of the telephone
conversation with Dr. Woods] from my notes about my interview."

22 - OPINION AND ORDER

Decl. of Michelle Burrows (#170) at ¶ 5.  In her summary of her
interview with Dr. Woods, Burrows states:

> I took notes throughout the interview but
> Dr. Woods spoke quickly.
>
> * * *
>
> I am reading from my notes which may not be
> complete or . . . thorough, but I still have the
> notes and I'm positive Dr. Woods would be willing
> to write an affidavit or speak again should we
> need.  Any errors in this report are mine - I
> understood what he was saying I'm just not
> confident I can adequately translate it.

Burrows Decl. in support of Pl.'s Resp. to Defs.' Mot. for Summ.
J., Ex. 7 at 1, 2.

On March 6, 2013, the parties advised the Court in a Joint
Status Report that defense counsel Shannon Vincent asked
Plaintiff for a release so Vincent could speak to Dr. Woods about
Plaintiff's examination and Dr. Woods's report.  Plaintiff
initially declined, but he eventually provided a release to
Vincent.  Dr. Woods, however, would not speak with Vincent
without payment in advance.  Vincent testifies in her Declaration
that Dr. Woods did not have an "approved vendor contract" with
the State of Oregon, and Vincent's request for permission to pay
for a telephone call with Dr. Woods was denied.

Dr. Woods died on May 15, 2013.  Vincent did not have an
opportunity to talk with him about his report before his death.

As noted, on June 6, 2013, Defendants filed a Motion for
Summary Judgment.  On July 17, 2013, Plaintiff filed a Response

23 - OPINION AND ORDER

to Defendants' Motion and included Burrows's Declaration in support of his Response.  Exhibit 7 to Burrows's Declaration is her summary of her telephone conversation with Dr. Woods and Dr. Woods's report of his examination of Plaintiff.

On August 5, 2013, Defendants filed a Motion to Strike Exhibit 7 to Burrows's Declaration on the grounds that it is inadmissible hearsay and has not been properly authenticated. Plaintiff did not file a Response to Defendants' Motion to Strike.

## II. Discussion

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(a), (c).  Hearsay is inadmissible unless it is defined as nonhearsay under Federal Rule of Evidence 801(d) or it falls within a hearsay exception under Federal Rule of Evidence 803, 804, or 807.  *See* Fed. R. Evid. 802.  Hearsay evidence may not be considered by a court ruling on a motion for summary judgment. *Greene v. FedEx Kinko's Inc.*, No. 06-35715, 2007 WL 2915436, at *1 (9th Cir. Oct. 4, 2007)("This testimony is inadmissible hearsay and may not be considered on review of the district court's summary judgment.").  *See also Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 667 (9th Cir. 1980)(same).

### A. Burrows's summary of her telephone conversation with Dr. Woods

Courts have held statements made to a declarant by a

24 - OPINION AND ORDER

third person are inadmissible hearsay when there is not any
exception to the hearsay rule set out by the declaration's
proponent. *See, e.g., Chao v. Westside Drywall, Inc.*, 709 F.
Supp. 2d 1037, 1048 (D. Or. 2010)("The last two sentences of
Paragraph 4 and the first sentence of Paragraph 12 of Clark's
amended declaration relate statements made to her by third
persons, thus they are hearsay and subject to exclusion unless an
exception to the hearsay rule applies."); *Hess v. Multnomah Cty,*
211 F.R.D. 403, 406 (D. Or. 2001)(court struck as inadmissible
hearsay exhibits attached to an attorney's affidavit that
purported to be notes of an exit interview with one witness
conducted by a third party and a summary of an interview of
another witness conducted by a different third party).

Here Plaintiff seeks to admit the summary of Burrows's
telephone conversation with Dr. Woods for the truth of the
matters contained in that summary.  Burrows's interview summary,
however, is hearsay.  Plaintiff fails to identify any exception
to the hearsay rule that would render Burrows's summary
admissible.

Accordingly, the Court grants Defendants' Motion to
Strike Burrows's summary of her telephone conversation with
Dr. Woods.

**B.   Dr. Woods's report**

Exhibit 7 to Burrows's Declaration also contains

Dr. Woods's report of his medical examination of Plaintiff. Defendants move to strike Dr. Woods's report on the grounds that it is hearsay and unauthenticated.

Courts have held unsworn expert reports are inadmissible hearsay and, therefore, do not constitute a sufficient basis to oppose summary judgment. *See, e.g., McFadden v. City of El Centro*, No. 10CV2042-WQH-WMC, 2012 WL 4486265, at *7 (S.D. Cal. Sept. 26, 2012)("[U]nsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment." (quotation omitted)); *Aecon Bldgs., Inc. v. Zurich N. Am.,* 572 F. Supp. 2d 1227, 1237 (W.D. Wash. 2008)("the expert report must be stricken because it is unsworn hearsay."); Wesley v. Davis, 333 F. Supp. 2d 888, 893 (C.D. Cal. 2004)("The only evidence that supports any of the [plaintiff's] first three claims is Dr. John S. Videen's letter. Unfortunately for Plaintiff . . . Dr. Videen's letter is hearsay, not within an exception.  It is unsworn, and thus fails to qualify as a declaration. . . .  Thus, Defendants' Motion for Summary Judgment with respect to each of Plaintiff's first three claims is granted.").

Dr. Woods's report is unsworn, and that failure cannot be cured now through the submission of a declaration or affidavit verifying its contents because Dr. Woods has passed away.

Accordingly, the Court grants Defendants' Motion to

Strike Dr. Woods's report.


## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    Summary Judgment Standards

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  *See also* Fed. R. Civ. P. 56(a).  The moving party must show the absence of a dispute as to a material fact.  *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial.  *Id.*  "This burden is not a light one. . . .  The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Sluimer*

27 - OPINION AND ORDER

*v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted).  A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment."  *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary."  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.

## II.  Eighth Amendment

Plaintiff alleges in his Amended Complaint that Defendants were deliberately indifferent to his serious medical needs in their evaluation and treatment of Plaintiff's November 2008 injury and cervical spine issues.  Specifically Plaintiff asserts Defendants violated the Eighth Amendment when (1) they failed to

get Plaintiff an MRI for seven weeks after his November 2008
injury; (2) several weeks elapsed between Plaintiff's December
2008 and January 2009 examinations by Dr. Camp; (3) Defendants
did not provide cervical surgery for Plaintiff until March 2009;
(4) Defendants did not provide Plaintiff with sufficient pain
management; and (5) Defendants failed to provide Plaintiff with
Prilosec for a month.

    **A.**   **Standards**

      Deliberate indifference to serious medical needs is a
cognizable claim for violation of the Eighth Amendment
proscription against cruel and unusual punishment.  *Estelle v.
Gamble*, 429 U.S. 97, 104 (1976).  *See also Actkinson v. Vargo*,
284 F. App'x 469, 472 (9th Cir. 2008).

> To sustain [a] deliberate indifference claim, [a
> plaintiff must] meet the following test:  "First,
> the plaintiff must show a serious medical need by
> demonstrating that failure to treat a prisoner's
> condition could result in further significant
> injury or the unnecessary and wanton infliction of
> pain.  Second, the plaintiff must show the
> defendant's response to the need was deliberately
> indifferent."

*Peralta v. Dillard*, No. 09-55907, 2013 WL 57893, at *3 (9th Cir.
Jan. 7, 2013)(quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th
Cir. 2006)).  To satisfy the second prong (*i.e.,* that defendant's
response to the need was deliberately indifferent), a plaintiff
must show:  "'(a) a purposeful act or failure to respond to a
prisoner's pain or possible medical need and (b) harm caused by

the indifference.'"  *Id*. (quoting *Jett*, 439 F.3d at 1096).

Deliberate indifference may be established by showing that prison

officials deny, delay, or intentionally interfere with medical

treatment or it may be demonstrated by the way prison officials

provide medical care.  *Jett*, 439 F.3d at 1096.

        "Mere negligence in diagnosing or treating a medical

condition, without more, does not violate a prisoner's Eighth

Amendment rights."  *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th

Cir. 2004)(citation omitted).  *See also Wilhelm v. Rotman*, 680

F.3d 1113, 1122 (9th Cir. 2012)("Medical malpractice does not

become a constitutional violation merely because the victim is a

prisoner.").  In addition, "a plaintiff's showing of nothing more

than a difference of medical opinion as to the need to pursue one

course of treatment over another [is] insufficient, as a matter

of law, to establish deliberate indifference."  *Wilhelm*, 680 F.3d

at 1122 (quotation omitted).

    **B.    MRI**

        As noted, Plaintiff asserts Defendants were

deliberately indifferent to his serious medical needs when they

failed to obtain an MRI of Plaintiff's cervical spine until

December 26, 2008.

        Defendants assert this does not constitute deliberate

indifference as a matter of law.  Specifically, Defendants point

out that the Supreme Court held in *Estelle* that "the question

whether an X-ray or additional diagnostic testing or forms of
treatment is indicated is a classic example of a matter for
medical judgment.  A medical decision not to order an X-ray, or
like measures, does not represent cruel and unusual punishment."
429 U.S. at 106.  *See also Manley v. Nv. Dep't of Corr.*, Case No.
3:07-cv-00347-LRH, 2009 WL 2949502, at *6 (D. Nev. Sept. 11,
2009)(corrections-facility physician not deliberately indifferent
for declining to order MRI on inmate's back because "[a] doctor's
decision not to order a particular test or procedure is a matter
of medical judgment, and a denial of that test does not
constitute cruel and unusual punishment.").

     In addition, Plaintiff did not offer any admissible
medical-expert testimony to support his contention that
Defendants knew between November 2008 and December 2008 that
Plaintiff suffered from a neurological condition that required an
immediate MRI and intentionally refused to provide it.[3]  Courts
have held expert medical evidence will almost always be required
to establish deliberate indifference when cases involve complex
medical issues and a plaintiff contests the type of treatment
that he received.  *See, e.g., Hutchinson v. United States*, 838
F.2d 390 (9th Cir. 1988); *Watson v. Sisto*, Case No. 2:07-cv-

---

[3] The only medical-expert evidence relied on by Plaintiff is
Burrows's summary of her telephone conversation with Dr. Woods
and Dr. Woods's report, both of which are inadmissible and have
been stricken.

31 - OPINION AND ORDER

01871, at *20-22 (E.D. Cal. Oct. 28, 2011)("[A]lthough there may
be subsidiary issues of fact in dispute, unless plaintiff can
provide expert evidence that the treatment he received equated
with deliberate indifference, thereby creating a material issue
of fact, summary judgment should be entered for the defendant.").

       In *Hutchinson* an inmate alleged the medical treatment
she had received at a correctional center was constitutionally
deficient.  The defendants moved for summary judgment and
submitted testimony from a treating physician who stated although
there was a slight delay in the defendants' diagnosis of the
plaintiff's kidney stone, the delay did not result in permanent
damage.  838 F.2d at 393.  The plaintiff did not offer affidavits
or depositions of experts to contradict the treating physician's
statements but instead relied on her allegations and conclusory
statements that the defendants had failed to conform to the
applicable standard of care.  *Id.*  The court granted the
defendants' motion for summary judgment on the ground that the
plaintiff failed to support her allegations in the face of the
defendants' evidence.  *Id.*

       Finally, here the record reflects Plaintiff was seen
frequently by medical personnel and obtained various treatments,
including surgery on his hernia, during the period of November
2008 to December 2008.

       Viewing the evidence in the light most favorable to

32 - OPINION AND ORDER

Plaintiff, the Court finds no reasonable juror could conclude on this record that Defendants' failure to obtain an MRI of Plaintiff's cervical spine until December 2008 constituted deliberate indifference to a substantial risk of harm to Plaintiff's health.  Plaintiff, therefore, has not established Defendants' conduct in that regard violated Plaintiff's rights under the Eighth Amendment.

**C.   Time between Plaintiff's first and second examinations by Dr. Camp**

As noted, Plaintiff was examined by Dr. Camp on December 8, 2008, and again on January 22, 2009.  Plaintiff asserts the time between his examinations indicates Defendants were deliberately indifferent to his serious medical condition. The record reflects after Dr. Camp examined Plaintiff on December 8, 2008, Plaintiff received the MRI that Dr. Camp recommended, and on December 31, 2008, Plaintiff was approved by the TLC Committee for another neurosurgical consultation with Dr. Camp.  Plaintiff does not point to any medical-expert testimony that the delay between Plaintiff's first and second appointments with Dr. Camp was intended to cause Plaintiff harm or that the delay had permanent or far-reaching consequences with respect to Plaintiff's condition.  In fact, at Plaintiff's January 22, 2009, appointment, Dr. Camp noted Plaintiff's range of motion in his cervical spine was only "modestly diminished." Dr. Camp recommended conservative treatment.

33 - OPINION AND ORDER

Viewing the evidence in the light most favorable to Plaintiff, the Court finds no reasonable juror could conclude on this record that the time between Plaintiff's first and second examinations by Dr. Camp establishes Defendants were deliberately indifferent to a substantial risk of harm to Plaintiff's health. Plaintiff, therefore, has not established Defendants' conduct in that regard violated Plaintiff's rights under the Eighth Amendment.

**D.    Timing of surgery**

Plaintiff contends the time between his November 2008 accident and his March 30, 2009, surgery constituted deliberate indifference to his serious medical issues. The record, however, reflects Plaintiff received Ibuprofen and Tylenol, hot packs, traction, and neurosurgical consultations before he underwent surgery. In addition, Dr. Camp recommended conservative treatment at all times before Plaintiff's March 3, 2009, examination. Plaintiff does not offer any expert medical testimony to suggest that he should have undergone surgery before March 2009 or that the failure to do so constituted deliberate indifference.

Finally, even if the Court considered the summary report of Dr. Woods's conversation with Plaintiff's counsel, that summary notes "surgery is usually intervention of the last resort" and the doctor "did not know whether the delay between

the injury and the surgery made a difference."

Viewing the evidence in the light most favorable to Plaintiff, the Court finds no reasonable juror could conclude on this record that the time between Plaintiff's injury and his surgery establishes Defendants were deliberately indifferent to a substantial risk of harm to Plaintiff's health.  Plaintiff, therefore, has not established Defendants' conduct in that regard violated Plaintiff's rights under the Eighth Amendment.

**E.    Pain management**

Plaintiff asserts Defendants were deliberately indifferent to his serious medical needs when they did not provide him with therapy, massage, acupuncture, a wedge, or a special pillow and when they improperly performed traction. Dr. Camp, however, did not prescribe a wedge for Plaintiff. Dr. Camp only prescribed a second pillow for Plaintiff at Plaintiff's September 15, 2009, appointment and Dr. Diehl ordered a second pillow for Plaintiff on September 28, 2009.  At Plaintiff's January 2009 examination, Dr. Camp recommended "sleeping with a thin, firm pillow that can be rolled so that the head will not tilt."

In addition, in September 2009 Dr. Camp explained to Plaintiff that the "course of treatment to ameliorate symptoms" could include massage but his condition did not require massage. Dr. Camp advised Plaintiff that when various treatments fail, "we

35 - OPINION AND ORDER

usually just have a circumstance where the best treatment in the long term is no treatment. We do not recommend taking chronic medications for this problem unless those medications might be something like Elavil or Neurontin." Plaintiff does not point to any medical-expert evidence to support his assertion that failure to provide therapy, massage, acupuncture, a wedge, or a special pillow was in contravention of Dr. Camp's orders or that it resulted in further significant injury.

With respect to Plaintiff's allegation that traction was improperly performed, Plaintiff does not offer any evidence from any medical expert to support his allegation, and there is not any evidence in the record from which a jury could infer Defendants did not provide proper traction treatment. In contrast, Dr. Diehl testifies in his Declaration that Plaintiff's treatment was consistent with the standard of treatment in the community. Diehl Decl. at ¶ 36. At best, Plaintiff merely disagrees with the course of treatment provided by Defendants.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds no reasonable juror could conclude on this record that Defendants were deliberately indifferent to a substantial risk of harm to Plaintiff's health when they did not provide him with therapy, massage, acupuncture, a wedge, or a special pillow or when they performed traction.

36 - OPINION AND ORDER

**F.    Prilosec Prescriptions**

Plaintiff appears to assert Defendants were deliberately indifferent to his serious medical needs when they failed to refill his prescription for Prilosec from February 11, 2009, through February 27, 2009, and, as a result, Plaintiff suffered gastric upset.  The Ninth Circuit has held as a matter of law that even repeated failures by prison staff to "satisfy [an inmate's] requests for aspirins and antacids to alleviate [the inmate's] headaches, nausea and pains . . . do not amount to a constitutional violation."  *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990).  The court in *O'Loughlin* concluded the plaintiff's Eighth Amendment claim for failure to provide antacids was akin to a claim for negligence or medical malpractice, neither of which is a cognizable Eighth Amendment claim.  *Id*.  Similarly, here Defendants' failure to renew Plaintiff's prescription for Prilosec for 16 days, during which time Plaintiff received at least one dose of the medication, does not amount to a constitutional violation as a matter of law.

Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's claims for violation of the Eighth Amendment based on Defendants' alleged failure to provide adequate medical treatment.

**III. Retaliation**

Plaintiff asserts Defendants retaliated against him in

37 - OPINION AND ORDER

violation of his First Amendment right to free speech when (1) Nurse Shotts moved Plaintiff out of the infirmary on May 1, 2009; (2) Defendants denied him Prilosec; and (3) Dr. Diehl transferred him to Salem, Oregon, and then cancelled his appointment with Dr. Becker.

### A.   Standard

The Ninth Circuit has held retaliation against a prisoner for the exercise of a constitutionally protected right is a constitutional violation.  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).  *See also Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir. 1990)("proper acts are actionable under § 1983 if done in retaliation for filing a grievance pursuant to established prison procedures").

> Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Id.* (citing *Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000)).

### B.   Move from the infirmary

Plaintiff contends Nurse Shotts had him removed from the infirmary on May 1, 2009, in retaliation for Plaintiff's state habeas action and grievances about his healthcare.  The record, however, reflects Nurse Shotts was not involved in the

38 - OPINION AND ORDER

decision to move Plaintiff out of the infirmary. Dr. Diehl testifies in his Declaration that because he was Plaintiff's treating physician, it was solely his decision whether Plaintiff was sufficiently healed to be returned to the general population. Diehl Decl. at ¶ 16. Dr. Diehl further testifies he concluded by May 1, 2009, that Plaintiff did not require the daily nursing care that he had been receiving in the infirmary because Plaintiff was able to perform the activities of daily living. Plaintiff does not point to any evidence that contradicts Dr. Diehl's testimony. Although Plaintiff testifies in his Declaration that he does not believe a doctor ordered him to be removed from the infirmary, Plaintiff's testimony is insufficient to establish a material dispute of fact exists as to whether Plaintiff was removed from the infirmary by Nurse Shotts in retaliation for Plaintiff's state habeas action and various grievances.

**C.    Denial of Prilosec**

Plaintiff appears to assert Defendants denied him Prilosec in retaliation for his filing o various grievances. The record, however, reflects when Plaintiff requested a refill of Prilosec, medical staff was required to review the request with a treating doctor and Plaintiff was provided with a dosage after a doctor refilled his prescription. Plaintiff does not point to any evidence in the record that establishes a prescription refill

request was not required to be reviewed by a physician or that it
is not a legitimate correctional goal to require a physician to
review a request for medication prior to issuing a refill.
Plaintiff testifies in his Declaration that "Prilosec is a
commonly and regularly prescribed medication in EOCI and I was
told there was always plenty of back up."  Wills Decl. at ¶ 42.
Plaintiff's testimony, however, is insufficient to establish a
genuine dispute of material fact exists as to whether Defendants'
refusal to refill Plaintiff's Prilosec prescription until his
request was reviewed by a physician was in retaliation for
Plaintiff's of filing various grievances.

**D.    Appointment with Dr. Becker**

Plaintiff contends Dr. Diehl "orchestrated" Plaintiff's
transfer to Salem and cancelled his appointment with Dr. Becker
in retaliation for Plaintiff's filing of various grievances.  The
record, however, reflects Defendants were attempting to obtain
more care for Plaintiff when they transferred him to Salem to
have him evaluated by Dr. Becker.  The record also reflects
Plaintiff's appointment with Dr. Becker was cancelled to allow
Plaintiff to get to an appointment with Dr. Camp, his treating
neurosurgeon.  There is not any evidence to support Plaintiff's
allegation other than Plaintiff's speculation that Dr. Diehl
transferred Plaintiff to and from Salem and cancelled Plaintiff's
appointment with Dr. Becker in retaliation for Plaintiff's filing

40 - OPINION AND ORDER

of various grievances.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's claim for retaliation.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendants' Motion (#190) to Strike, **GRANTS** Defendants' Motion (#176) for Summary Judgment, and **DISMISSES** this matter **with prejudice**.

IT IS SO ORDERED.

DATED this 10th day of October, 2013.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge


41 - OPINION AND ORDER